## 6170.  RICKS *v.* THE STATE.

1. One who knowingly misrepresents a defective horse as being sound, and thereby cheats and defrauds a person swapping for the animal, is, under section 719 of the Penal Code, guilty of being a common cheat and swindler; but where the evidence shows that these defects were not only patent and discoverable by ordinary diligence, but were actually discovered by the prosecutor before the trade was concluded, a conviction was unauthorized.

2. Where one is accused of being a common cheat and swindler, the jury may be authorized to find from circumstances that the defendant had knowledge that defects in a horse traded by him, and which he represented to be sound, existed at the time the representations were made; nevertheless the defendant's knowledge of such defects must be proved in some way before a conviction will be authorized. Mere suspicion will not suffice.
DECIDED JANUARY 20, 1915.

Accusation of misdemeanor; from city court of Tifton—Judge R. Eve. November 6, 1914.

*J. J. Forehand,* for plaintiff in error.

*J. J. Price, solicitor,* contra.

WADE, J. During the fall of 1913 the accused went to the home of J. A. Goodwin, near Ty Ty, Georgia, and carried with him a one-eyed bay mare, which he proposed to trade for an old horse be-

longing to Goodwin.  Goodwin testified on the trial that he "looked at the mare, she was blind in one eye, but Robert [R. E. Ricks, the defendant] said that the other eye was perfectly good.  I examined what he called the good eye, and saw that something was wrong with it, or I thought there was a defect in it, and called Robert's attention to it, and he said it was perfectly good and it must be good when he said so."  He further said that she was a good mare and that he just wanted to show me what a good trade he could give me.  So, upon his recommendation and guarantee of the eye, I traded with him and promised him $50 to boot."  After Goodwin had traded on Saturday afternoon, his boy took the mare off and stayed away until Monday morning.  Before the boy brought the mare back, Ricks came to Goodwin's house very early Monday morning and bought some cattle from him in adjustment of the boot due on the horse trade.  About nine o'clock on that morning, and after Ricks had gone, Goodwin's son returned home with the mare, and Goodwin found that both of the animal's eyes were badly inflamed, and that the eye which Ricks "claimed was a good eye was entirely gone, she could not see out of it at all, and that she was totally blind."  It appeared further that the mare's eye remained in this condition for two weeks before there was any change, and that Goodwin went to see the defendant on Friday following the day the trade was made and told him the mare was blind, and asked him to "make his word good," and told him he wanted his "cattle" back; that the defendant said that he did not know whether he could get the cattle or not, but told Goodwin to wait there and he would see about it, but instead he took the train and went to Tifton.  After two weeks the mare's eyes improved, and occasionally since that time she goes blind and remains so for several days and then gets better—"the blind spells in the mare's eyes get further and further apart."  Goodwin testified, that Ricks told him on Monday morning, after Ricks "had gotten the cattle and started off," and in response to an inquiry as to where he obtained the mare he traded to Goodwin, that he got her from Gipsies; but when the trade was made on Saturday before, he said that he got the mare from "some fellow down below Ty Ty, Georgia."  Another witness for the State said, that he was at Ty Ty, Georgia, during the latter part of the year 1913, or the first part of the year 1914, and had a talk with the defendant, in which the defend-

ant stated that he had been doing some good horse-swapping lately, and had traded some with the Gipsies who had been around Ty Ty, and had done some good trading with the stock he got from them; that he got an animal that was nearly blind and patched up her eyes and traded her off and made a good trade. The witness could not say whether the horse traded to Goodwin was the horse Ricks was talking to him about or not, but Ricks made the statement about the time of the trade between him and Goodwin. This was all the evidence for the State. The defendant, in his statement to the jury, said that at the time he traded the mare to Goodwin he had only had the mare two or three days, and that he told Goodwin of this fact; that her eye looked all right to him, and that Goodwin had the mare from Saturday night through Sunday, and up to the time on Monday when he paid the boot; which was about as long as the defendant had owned her before the trade; that this was not the mare the defendant got from the Gipsies, which he told Mr. Hitchcock about, and he did not know that the mare's eye was nearly out, and in fact it was not out yet. Since the motion for a new trial is based upon the usual general grounds alone, it is only necessary to determine whether the evidence was sufficient to authorize the verdict.

In the case of *Rainey* v. *State, 94 Ga.* 599 (19 S. E. 892), which involved a similar prosecution growing out of a horse trade, it appeared that the party who traded with the defendant *thought* he discovered something wrong in one of the mare's legs and so told the defendant, who replied, "No, there is nothing the matter with her; it is the way she is standing;" and the defendant further said that the mare was "all right," but she turned out afterwards to be weak-eyed and had a big leg. The witness further said that he did not know that the defendant knew at the time that anything was wrong with the mare. A majority of the Supreme Court held that as the evidence showed that the defects in the mare traded by the accused to the prosecutor were patent, and were actually discovered by the latter before the trade was concluded, a conviction was not authorized. In *Tatum* v. *State, 58 Ga.* 409, the court said that "Knowingly to misrepresent a blind horse as sound (the horse's eyes being apparently good), and thereby to cheat and defraud a person swapping for the animal, is to commit the offense of being a common cheat and swindler, under section of the Code

4595" (Penal Code of 1910, § 719). From the opinion in that case it appears that the evidence showed that the eyes of the mare traded "were perfect in appearance, and not to be distinguished by inspection from sound eyes;" so that there was nothing even to put the defendant on inquiry as to the condition of the mare's eyes, much less any defect so apparent as to be properly called a patent defect. In the *Rainey* case, supra, the prosecutor testified: "I thought I discovered something wrong with one of the mare's legs, and so told the defendant." In the case under consideration it will be observed that the prosecutor said: "I examined what he [the defendant] called the good eye, and saw that something was wrong with it, or I thought there was a defect in it, and called Robert's attention to it, and he said it was perfectly good and it must be good when he said so." This evidence apparently puts this case directly under the ruling made in the *Rainey* case, supra, since it appears that the defects in the one-eyed bay mare traded by Ricks to Goodwin were patent and were actually discovered by Goodwin before the trade was concluded; and hence the conviction of the accused of the offense of being a common cheat and swindler was not warranted, although he represented that the mare was perfectly sound, and especially made representations as to the defects observed by the prosecutor. The difference, therefore, between the *Tatum* case, supra, and the case under consideration (as well as the *Rainey* case, supra), is obvious, since both in the *Rainey* case and in this case the defects were noticeable and discovered before the trade was consummated; whereas in the *Tatum* case the defect was neither apparent nor discoverable by ordinary inspection. We would feel constrained, therefore, to reverse the judgment of the trial court, under the ruling made in the *Rainey* case, if that were the sole question involved.

In another particular we conclude that the evidence was insufficient to authorize the verdict of guilty, since it does not appear, either from any direct proof or from proof of circumstances, that the defendant had any knowledge, at the time he represented to Goodwin that the mare was sound, that these representations were false and that the eye which he said was sound was in fact defective. It is true such knowledge may be shown by circumstances, including the opportunities which the accused had to ascertain the facts, but it must be established in some way before a conviction would

be authorized. The only evidence relied upon to show that the accused knew of the defects in the mare at the time he made the trade with the prosecutor is the evidence of the prosecutor that the accused told him, on the day he traded the mare, that he procured her "from some fellow down below Ty Ty, Georgia," and that, on Monday morning following, the accused stated that "he got her from the Gipsies;" and the evidence of Hitchcock that about the day when the trade with Goodwin was made the defendant told him "that he [the defendant] had traded some with the Gipsies who had been around Ty Ty, and had done some good trading with the stock which he got from them, and that he got an animal which was nearly blind, that he patched her eye up, and made a good trade." This witness, however, stated that he did not know whether the horse traded to Goodwin was the one the defendant told him about or not, nor was there any other evidence to show that this was the horse the defendant had reference to when he was talking to Hitchcock, and in fact the defendant in his statement expressly denied that the horse he told Hitchcock about was the same one traded to Goodwin, or was one he got "from the Gipsies." There is no other evidence tending to show even remotely that the defendant had any knowledge that his representations in regard to the horse's eye were untrue at the time he made them to Goodwin, nor were the jury authorized to infer from any other facts proved that he had such knowledge, since it appears from his statement that he had only had the horse two or three days, and there is no evidence to contradict this assertion; and while we may suspect that the defendant had more knowledge as to the defect in the eye of the animal traded to Goodwin than he admitted, still something more than a mere suspicion is necessary to sustain a conviction. In *Waterman* v. *State,* 114 *Ga.* 262-264 (40 S. E. 262), the Supreme Court said: "Since the deceitful means, necessary to sustain a conviction in a case of this character, *involve knowledge* of the falsity of the representation by the seller, no action or proceeding can be maintained without proof of the scienter; deceit is the foundation of the action, which can not exist without knowledge of the falsity of the representation upon which the other party acted. Mr. Wharton is amply supported by authority when, in his Criminal Law, in discussing this subject, he says (vol. 2, § 1185): 'The statement must not only be false in fact, but false to the knowledge

of its utterer.' The knowledge that the representations were false must be proved to exist, before the offense charged is made out."

*Judgment reversed.*